UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | | |
|---|---|---|
| **JOHN COLE** | * | **Civil Action No.:** |
| | * | |
| **Plaintiff,** | * | |
| | * | **MAGISTRATE:** |
| **VS.** | * | |
| | * | |
| **QUALITY CARRIERS, INC., A** | * | |
| **SUBSIDIARY OF CSX CORPORATION** | * | **JUDGE:** |
| | * | |
| **Defendant.** | * | |
| | * | **JURY TRIAL REQUESTED** |

## ORIGINAL COMPLAINT

JOHN COLE ("Plaintiff"), by and through his attorneys, brings this action for damages and other legal and equitable relief from the Defendant's violation of the laws proscribing discrimination based on race and for acts of retaliation against QUALITY CARRIERS, INC., A SUBSIDIARY OF CSX CORPORATION ("Defendant").

## INTRODUCTION

This is an action brought by Plaintiff seeking damages from Defendant for acts of intentional discrimination based on race, as well as for acts of retaliation because Plaintiff engaged in protected activity. Defendant's acts of discrimination and retaliation are in violation of Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), 42 U.S.C. § 2000e, *et seq.,* the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981, *et seq*.; (§ "1981"), § 102 of the 1991 Civil Rights Act, and the Louisiana Employment Discrimination Law, La. Stat. § 23:332 *et seq*. ("LEDL"), and any other cause(s) of action that can be inferred from the facts set forth herein.

## JURISDICTION AND VENUE

1. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, which confers original jurisdiction upon this Court for actions arising under the laws of the United States, and pursuant to 28 U.S.C. §§ 1343(3) and 1343(4), which confer original jurisdiction upon this Court in a civil action to recover damages or to secure equitable relief (i) under any Act of Congress providing for the protection of civil rights; (ii) under the Declaratory Judgment Statute, 28 U.S.C. § 2201; (iii) 42 U.S.C. § 1981, *et seq*., as amended, and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, *et seq.,* as amended. This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1367, which confers supplemental jurisdiction upon this Court for all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

1. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District. Venue is also proper under §706 of Title VII, 42 U.S.C. § 2000e-5(3)(f), in that the acts complained of herein, including unlawful employment practices, occurred within the federal District over which this Court has jurisdiction.

## PARTIES

3. At all relevant times, Defendant has continuously been and are now doing business in the State of Louisiana and has continuously had at least fifteen employees.

4. At all relevant times, Defendant has continuously been an employer engaged in an industry affecting commerce under § § 701(b), (g) and (h) of Title VII, 42 U.S.C. §2000e-(b), (g) and (h), § 1981 and the Louisiana Employment Discrimination Law.

5. Defendant is a subsidiary of a Fortune 500 publicly traded company and operates the largest liquid bulk chemical trucking network in North America with trucking terminals across North America. Defendant is headquartered at 1208 East Kennedy Boulevard, Suite 132, Tampa, Florida 33602.

6. At all relevant times, Plaintiff worked at trucking terminal Quality Carriers, Inc. #192. ("QC-192"), which is owned and operated by Defendant. The trucking terminal is located at 5500 Commerce Dr, Bossier City, Louisiana 71111.

7. At all relevant times, Plaintiff was an employee of Defendant as that term is defined in Title VII, § 1981 and the Louisiana Employment Discrimination Law.

8. Plaintiff is African American.

## EXHAUSTION OF FEDERAL ADMINISTRATIVE REMEDIES

9. Plaintiff has timely filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), which constitutes across-filing with the Louisiana Commission on Human Rights, on December 18, 2020.

10. Plaintiff requested his Notice of Right to Sue from the EEOC on August 17, 2021, within ninety (90) days prior to the filing of this Complaint.

## FACTS UNDERLYING CLAIMS

11. Plaintiff began working for Defendant as a "Preloader" Driver in Defendant's Fort Worth, Texas terminal on or around September 5, 2018.

12. As a Preloader Driver, Plaintiff's responsibilities included loading chemical freight at a customer of Defendant work site, driving said chemical freight to a trucking terminal of Defendant, and transferring a chemical freight delivery to another driver.

13. A position as a Preloader Driver is a desirable and preferred position with Defendant, as a Preloader Driver has a stable, predictable schedule with the ability to be home each night.

14. Upon information and belief, Defendant's Forth Worth Terminal lost a major trucking and delivery contract. As a result of losing the contract, the terminal became overstaffed.

15. Plaintiff was then offered the opportunity to transfer to Defendant's Terminal, QC-192, in Bossier City, Louisiana.

16. Plaintiff accepted the opportunity with the conditions that Plaintiff's schedule and role as a Preloader Driver would remain unchanged.

17. Plaintiff was able to confirm the conditions of the transfer with Sam McCullough, the Terminal Manager of QC-192 at that time.

18. Plaintiff then transferred to QC-192 in or around February 2019.

19. Shortly after the transfer, Plaintiff discovered all of the management at QC-192 were White.

20. Additionally, in or around March 2019, Mr. McCullough was replaced by another White employee, John Beasley. Mr. Beasley was then the Terminal Manager of QC-192. Mr. McCullough became the Load manager at QC-192.

### DISCRIMINATORY ASSIGNMENTS AND UNEQUAL PAY

21. In or around June 2019, Plaintiff approached his supervisor, Mr. Beasley, about issues related to compensation. At that time, Plaintiff was paid $60.00 per load as a Preloader Driver. Plaintiff spoke with Mr. Beasley about a pay increase or a switch to another position in order to earn more income.

ORIGINAL COMPLAINT

22. Mr. Beasley then made Plaintiff aware that, in two weeks, Preloader Drivers would receive a pay increase. The pay per load would increase from $60.00 per load to $125.00 per load.

23. Upon information and belief, in the same conversation, Mr. Beasley told Plaintiff that he and QC-192 needed Plaintiff to remain as a Preloader Driver as Plaintiff was always on time and reliable.

24. Based on knowledge of a pay increase per load, Plaintiff's concerns about compensation were relieved. Plaintiff then continued his work as a Preloader Driver.

25. Upon information and belief, two weeks later, in or around the end of June 2019, the Preloader pay per load was increased to $125.

26. At or around the same time, Plaintiff noticed that he had been taken off Preloading work. As a result, Plaintiff was not benefiting from the pay increase. Plaintiff was not given any notice or explanation regarding his removal from Preloading work.

27. Plaintiff then approached Mr. Beasley regarding the Plaintiff's issues with Preloader work. Mr. Beasley confirmed that Plaintiff had been removed from Preloader work.

28. Plaintiff sought an explanation for his removal. Mr. Beasley explained that Plaintiff was removed due to issues with timeliness. Plaintiff was confused as he had no issues with timeliness, had not received any verbal or written warnings related to timeliness, and had been commended by Mr. Beasley on timeliness two weeks prior.

29. Shortly after meeting with Mr. Beasley, Plaintiff discovered that a White driver had taken Plaintiff's Preloading work and effectively replaced Plaintiff as a Preloader Driver. Further, the White driver was less qualified and less experienced than Plaintiff for Preloading work.

**ORIGINAL COMPLAINT**

30. Upon information and belief, Mr. Beasley and QC-192 management discriminated against Plaintiff on the basis of race by replacing him with a White driver. As a result, the White driver received the significant increased pay per load, not Plaintiff.

31. On or around June 25, shortly after discovering the apparent race discrimination, Plaintiff chose to email his Driver Retention Specialist, Marsha Brown. Plaintiff emailed Ms. Brown about the issues with Preloading work and the discrimination at QC-192. Plaintiff sought help from Ms. Brown related to these issues.

32. At that time, Plaintiff was not aware or given notice that he could report race discrimination directly to Defendant's Human Resources department ("HR").

33. Ms. Brown, upon learning about the discrimination, informed Plaintiff that she would direct Defendant's Human Resources Department to contact Plaintiff.

34. On or around June 26, 2019, Defendant's Senior Vice President of HR at the relevant times, Melissa Ernst, emailed Plaintiff to arrange a phone call between them. Later that day, Ms. Ernst and Plaintiff spoke on the phone regarding Plaintiff's experiences of race discrimination.

35. In or around July 2019, Ms. Ernst and Defendant's HR investigated QC-192 on the basis of discriminatory assignments with Plaintiff's removal from Preloading work.

36. Upon information and belief, the investigation into Plaintiff's complaint concluded that QC-192 had discriminated against Plaintiff by removing him from Preloading work and replacing him with a White driver.

37. As a result, on or around July 27, 2019, Ms. Ernst restored Plaintiff's role as a Preloader Driver at QC-192.

ORIGINAL COMPLAINT

38. Upon information and belief, Defendant did not take any other corrective action. Further, QC-192's management was not changed, and Mr. Beasley remained at Terminal.

39. After these events, Plaintiff continued to work on a consistent schedule as a Preloader Driver.

40. However, in or around January 2020, QC-192 began having financial difficulties.

41. In response, on or around February 9, 2020, QC-192 management decided to eliminate all Preloader Driver positions. Further, the pay was decreased to $80.00 per load for any preload work. Additionally, guaranteed pay promises per week were eliminated.

42. QC-192 management also eliminated any and all set Driver schedules. Instead, the driver dispatchers at QC-192 would dictate each Driver's work assignments and schedule.

43. Upon information and belief, the changes led to Plaintiff and other similarly situated Black Drivers to consistently be denied work opportunities.

44. The all-White driver dispatchers at QC-192 used the new policies to consistently prefer assigning work to White Drivers, over Plaintiff and other similarly situated Black Drivers. The effect was more pronounced as work opportunities at QC-192 became limited.

45. Upon information and belief, when work was limited, White Drivers were paid up to $1250 more per week compared to Plaintiff and other similarly situated Black drivers.

46. Further, upon information and belief, the all-White driver dispatchers used the new policies to consistently prefer assigning the easiest or shortest drive time work to White Drives, over Plaintiff and other similarly situated Black Drivers.

47. As a result, Plaintiff and other similarly situated Black drivers were assigned driving work on an unpredictable schedule, and were assigned work that was more difficult or included longer drive times.

**ORIGINAL COMPLAINT**

## RETALIATION

48. In or around August 2019, shortly after the investigation into Plaintiff's original discrimination complaint, QC-192 management and driver dispatchers began retaliating against Plaintiff through a campaign of targeted harassment.

49. Upon information and belief, the targeted harassment was intended to create reasons to terminate Plaintiff's employment.

50. The targeted harassment included attempts to make Plaintiff late on his work, attempts to sabotage Plaintiff's work, creating barriers for Plaintiff to complete his work, altering Plaintiff's work schedule, and seeking reasons to discipline Plaintiff.

51. Upon information and belief, in a specific attempt to sabotage Plaintiff's work, members of QC-192 management provided Plaintiff with fake or counterfeit paperwork on several occasions. Plaintiff could have been formally disciplined or terminated for filing fake or counterfeit paperwork.

52. In or around March 2020, Plaintiff finally reported the targeted harassment and retaliation to Ms. Ernst and Defendant's HR. Defendant's HR then conducted an investigation into Plaintiff's complaint.

53. Upon information and belief, Defendant's HR determined that QC-192 management and driver dispatchers had retaliated against Plaintiff through targeted harassment. Specifically, the investigation determined that QC-192 management had incorrectly used administrative and paperwork practices to harass Plaintiff.

54. As a result of the investigation, Ms. Ernst personally called Plaintiff to apologize for the actions of QC-192 management and driver dispatchers. Plaintiff was also switched to a different driver dispatcher.

55. However, no other corrective action was taken. Upon information and belief, Defendant did not discipline or take adverse action against the involved employees.

56. Ultimately, the lack of corrective action allowed the retaliation and harassment to continue after Plaintiff filed a complaint with Defendant's HR.

57. After these events, Plaintiff overheard QC-192 management and dispatchers discussing being wary of Plaintiff because "he would report to HR."

58. In or around March 2020, Mr. Beasley had a conversation with Plaintiff where Mr. Beasley explicitly told Plaintiff that he would not be any forced dispatches. Plaintiff left the conversation with the understanding that he had the right to refuse certain dispatched driving assignments.

59. After this conversation, in or around May 2020, Mr. Beasley retaliated against Plaintiff by arranging Plaintiff to be given driving assignments that involved the transportation of dangerous chemicals, specifically jet fuel and kerosene. Further, the pay per load on these assignments was lower than other assignments.

60. In order to safely load and drive these dangerous chemicals, a Driver needs to wear a properly fitted respirator as the inhalation of these chemicals can cause serious health issues. Drivers are required to have a valid, unexpired personal fit test for the respirator. Additionally, a valid personal fit test only lasts for one year.

61. At the time, Plaintiff did not possess a valid, unexpired personal fit test for a respirator as Plaintiff's personal fit test had expired. Plaintiff informed his driver manager and Mr. Beasley that Plaintiff could not safely do the assigned dangerous chemicals loads. However, QC-192 management attempted to force Plaintiff to do the dangerous assignment without a respirator.

**ORIGINAL COMPLAINT**

62. As a result, Plaintiff formally refused the dangerous dispatched driving assignments.

63. On or around May 11, 2020, Mr. Beasley then reported Plaintiff's refusal to Defendant's Employee Relations Manager, Alicia Kriz, and sought approval to terminate Plaintiff.

64. On or around May 14, 2020, approval was given to terminate Plaintiff on the basis of the legitimate refusal of the dangerous driving assignment.

65. Plaintiff was then formally terminated as an employee on or around May 16, 2020.

66. Throughout Plaintiff's employment with Defendant, Plaintiff was an exemplary employee. Plaintiff rarely took time off, did not have disciplinary write-ups until the retaliation occurred, and was even sent to a work conference for his exemplary work.

67. Defendant terminated Plaintiff in retaliation for his reporting of discrimination and relation based on race.

## CAUSES OF ACTION

### Count I
### EMPLOYMENT DISCRIMINATION ON THE BASIS OF RACE
*42 U.S.C. § 1981, et seq.*

68. Plaintiff repeats and re-alleges the allegations contained in the paragraphs above, as if fully set forth herein.

69. The conduct alleged herein violates 42 U.S.C. § 1981, *et seq*., as the Defendant has engaged in the practice of race discrimination including disparate treatment in the terms and conditions of his employment, including but not limited to discriminatory work assignments and disparate unequal pay.

70. Plaintiff's requests for relief are set forth below.

**ORIGINAL COMPLAINT**

## Count II
### EMPLOYMENT DISCRIMINATION – RETALIATION
*42 U.S.C. § 1981, et seq.*

71. Plaintiff repeats and re-alleges the allegations contained in the paragraphs above, as if fully set forth herein.

72. Plaintiff reported the discriminatory treatment to which he was subjected.

73. Defendant retaliated against Plaintiff by subjecting Plaintiff to reduced work hours, reduced pay, disparate discipline, sabotaged work, dangerous work conditions, and terminating his employment in response to his complaints about discrimination and retaliation.

74. Plaintiff's requests for relief are set forth below.

## Count III
### EMPLOYMENT DISCRIMINATION ON THE BASIS OF RACE
Title VII of the Civil Rights Act of 1964, as amended
*42 U.S.C. § 2000e, et seq.*

75. Plaintiff repeats and re-alleges the allegations contained in the paragraphs above, as if fully set forth herein.

76. The conduct alleged herein violates Title VII as the Defendant has engaged in the practice of discrimination against the Plaintiff based on his race, Black, by subjecting him to disparate treatment in the terms and conditions of his employment, including but not limited to discriminatory work assignments and disparate unequal pay.

77. Plaintiff's requests for relief are set forth below.

## Count IV
### EMPLOYMENT DISCRIMINATION - RETALIATION
Title VII of the Civil Rights Act of 1964, as amended
*42 U.S.C. § 2000e, et seq.*

78. Plaintiff repeats and re-alleges the allegations contained in the paragraphs above, as if fully set forth herein.

**ORIGINAL COMPLAINT**

79. Plaintiff reported discriminatory treatment based on race, Black.

80. Defendant retaliated against Plaintiff as to the terms and conditions of his employment through subjecting Plaintiff to reduced work hours, reduced pay, disparate discipline, sabotaged work, dangerous work conditions, and by terminating him in retaliation for engaging in protected activity.

81. Plaintiff's requests for relief are set forth below.

### Count V
### EMPLOYMENT DISCRIMINATION ON THE BASIS OF RACE
*Louisiana Employment Discrimination Law, La. Stat. § 23 :332, et seq.*

82. Plaintiff repeats and re-alleges the allegations contained in the paragraphs above, as if fully set forth herein.

83. The conduct alleged herein violates Louisiana Employment Discrimination Law, La. Stat. § 23:332 *et seq.*, as the Defendant has committed discrimination on the basis of race by subjecting him to disparate treatment in the terms and conditions of his employment, including but not limited to discriminatory work assignments and disparate unequal pay.

84. Plaintiff's requests for relief are set forth below.

### Count VI
### EMPLOYMENT DISCRIMINATION – RETALIATION
*Louisiana Employment Discrimination Law, La. Stat. § 23 :332, et seq.*

85. Plaintiff repeats and re-alleges the allegations contained in the paragraphs above, as if fully set forth herein.

86. Plaintiff reported the discriminatory treatment to which he was subjected.

87. The conduct alleged herein violates Louisiana Employment Discrimination Law, La. Stat. § 23:332 *et seq.* as Defendant have engaged in retaliation by, among other things, subjecting Plaintiff to reduced work hours, reduced pay, disparate discipline, sabotaged work,

dangerous work conditions, and terminating his employment in response to his complaints about discrimination and retaliation.

88. The Plaintiff's requests for relief are set forth below.

## DEMAND FOR JURY TRIAL

89. Plaintiff demands a jury trial on all matters raised in this Complaint.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for the following relief:

90. That the practices of the Defendant complained of herein be determined and adjudged to be in violation of the rights of Plaintiff under the federal and state laws identified above prohibiting discrimination and retaliation in employment;

91. That judgment be entered in favor of Plaintiff as set forth herein, and against Defendant, for back pay (including interest or an appropriate inflation factor), front pay, benefits and all other amounts owed to Plaintiff;

92. That Plaintiff be awarded compensatory damages for his employment discrimination claims including for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses;

93. That Plaintiff be awarded punitive damages for discriminatory practices done with malice or with reckless indifference to the federally protected rights of Plaintiff;

94. That Plaintiff be awarded pre-and post-judgment interest;

95. That the Court award Plaintiff reasonable attorneys' fees and costs associated with this matter, including but not limited to expert fees and costs;

96. That the Defendant be ordered to require training regarding discrimination based upon race and discrimination based on retaliation.

97. That the Court retain jurisdiction over Defendant until such time as it is satisfied that it has remedied the practices complained of and is determined to be in full compliance with the law; and

98. That the Plaintiff be awarded such other and further legal and equitable relief as may be found appropriate and as the Court may deem just or equitable.

Dated: November 15, 2021.

Respectfully submitted:

By: /s/ Philip Bohrer
Philip Bohrer  (#14089)
phil@bohrerbrady.com
**Bohrer Brady, LLC**
8712 Jefferson Highway, Suite B
Baton Rouge, Louisiana  70809
Telephone: (225) 925-5297
Facsimile: (225) 231-7000

Jay D. Ellwanger
(*to be admitted pro hac vice*)
Texas State Bar No. 24036522
jellwanger@equalrights.law
**Ellwanger Law LLLP**
8310-1 N. Capital of Texas Hwy., Ste. 190
Austin, Texas 78731
Telephone: (737) 808-2260
Facsimile: (737) 808-2262